UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 08 C 285 |
| v. | ) | |
| | ) | Judge Ronald A. Guzman |
| FUNDS IN THE AMOUNT OF | ) | |
| ONE HUNDRED NINETY-NINE | ) | |
| THOUSAND NINE HUNDRED EIGHTY | ) | |
| FIVE DOLLARS ($199,985.00), | ) | |
| | ) | |
| Defendant. | ) | |

**UNITED STATES' MOTION TO COMPEL DISCOVERY AND RESPONSE
TO CLAIMANT JACKSON'S MOTION TO SUPPRESS**

The United States of America, by Patrick J. Fitzgerald, United States Attorney for the

Northern District of Illinois, moves this Court pursuant to Federal Rules of Civil Procedure 26, 33,

34, and 37 for an order compelling the claimant, Jocelyne Marie Jackson ("Jackson"), to separately

and completely respond to interrogatory Nos. 1, 2, 4, 5, 6, 8, 10, and 14 of the United States' First

Set of Interrogatories and to production request Nos. 5 and 8 of the United States' First Set of

Production Requests, and submit to her noticed deposition prior to any evidentiary hearing on

Jackson's motion to suppress. In the alternative, should this Court decide that an evidentiary hearing

is warranted on the motion to suppress, the United States responds in opposition as follows.

**Introduction**

The United States filed a verified civil forfeiture complaint against $199,985.00 in United

States currency ("hereinafter referred to as the "defendant funds"), alleging that it was furnished or

intended to be furnished in exchange for a controlled substance, was the proceeds from the sale of

a controlled substance, or was used or intended to be used to facilitate a violation of the Controlled

Substance Act, 21 U.S.C. § 801, *et seq*., and was therefore, subject to forfeiture pursuant to 21

U.S.C. § 881(a)(6).

The United States issued its first set of interrogatories and production requests on March 20, 2008. The claimant served her responses to the United States' discovery requests on June 16, 2008, but those responses were incomplete. Specifically, the defendants failed to respond completely to interrogatory Nos. 1, 2, 4, 5, 6, 8, 10, and 14, and production request Nos. 5 and 8, which sought information and documents related to the source of defendant funds and claimant's income.

On June 26, 2008, claimant Jackson moved to suppress evidence obtained from the detention of her luggage, challenging the consent she gave to the agents to search her bag, and requests an evidentiary hearing. As explained below, any evidentiary hearing is premature and should be deferred until claimant has separately and fully complied with the government's outstanding discovery requests, including resolution of the instant motion to compel.

Further, claimant's Motion to suppress is without merit. The facts in this case will show that Jackson freely and voluntarily gave her consent to search her luggage. Alternatively, even if Jackson had not consented to the search, the narcotics tainted currency would have been inevitably discovered by the agents since they had sufficient articulable facts to detain Jackson's bag for a narcotics canine sniff. Thus, even without consent, the detention of the luggage would have been supported by reasonable suspicion.

### Statement of Facts[1]

On August 27, 2007, DEA Agents assigned to the DEA Transportation Interdiction Group at Amtrak Union Station in Chicago, Illinois, conducted a routine review of the computerized travel manifest for Amtrak. During review of the manifest, an agent noticed that Jackson had purchased one way, first class train tickets with cash one (1) day prior to travel from Atlanta, Georgia, to Emeryville, California, via Chicago, Illinois.

At approximately 1:45 p.m. on August 27, 2007, DEA agents proceeded to the train car

---

[1]The statement of facts is taken from the Verified Complaint for Forfeiture, filed on January 11, 2008.

where Jackson's room was located and waited for her arrival. Within minutes, Jackson arrived and entered her sleeper car room. DEA agents identified themselves to Jackson and conducted a noncustodial interview with Jackson. Jackson was never under arrest while on the train, and was always free to terminate the interview at any time. During the interview, agents asked Jackson if the luggage present was hers and if she had checked any other bags. Jackson told the agents that the luggage was hers and that she had also checked one bag. Further, she stated that no one had given her any packages to transport on the train. Jackson also advised the agents that she was not in possession of any weapons, illegal drugs or any large amounts of currency.

The DEA agents then asked if they could search her luggage, and Jackson stated, "Yes." When TFO Randal Szmergalski ("Szmergalski") began to pick up one bag, Jackson attempted to hand him another bag to search. TFO Szmergalski observed that the first bag had a lock on it and asked Jackson if she had the combination or the key and, after hesitating, she stated that she did not. During this time, Jackson appeared nervous and was hesitant and vague in her responses. TFO Szmergalski then asked if he could open the luggage by "popping" the zipper. Jackson consented to this procedure to open the luggage. Because he could feel the bag was heavy, TFO Szmergalski asked Jackson about the contents of her luggage and whether it contained money. Jackson replied that it did contain currency. TFO Szmergalski asked her approximately how much and Jackson replied, "about $7,000.00." At that time, TFO Szmergalski opened the bag and discovered multiple bundles of currency. When asked to provide documentation of the source of the money, Jackson was unable to do so.

DEA agents asked Jackson to accompany them to the DEA office at Union Station to continue the interview. Jackson voluntarily agreed to accompany the agents to continue the interview. While on the way to the DEA office, Jackson stated that her boyfriend owns strip clubs and that the money was from the business. Once inside the DEA office, Jackson was given a statement of rights form which she read but refused to sign. She was also given a written consent to search form for her luggage, which Jackson also refused to sign. During the continued interview

3

inside the DEA office, Jackson stated that she was an exotic dancer, she traveled a lot and lived in California. She said she had just spent a week working as an exotic dancer in Atlanta and was on her way home to California. She further stated that she has family members who support her financially and that the money in the luggage was hers but did not want to discuss it further without an attorney. Up to this point, Jackson was not in custody and was free to leave.

The Chicago Police Department responded with a narcotics detection canine, "Andy," and conducted an inspection of Jackson's bag containing the currency, as well as several control bags. "Andy" gave a positive alert for the presumptive presence of narcotic odor to the bag containing the currency. Only after the canine's positive alert to the money was Jackson then taken into custody.[2]

DEA Agents then seized a total of $199,985 from Jackson which included 410 one hundred dollar bills; 168 fifty dollar bills; 7,254 twenty dollar bills; 412 ten dollar bills; 279 five dollar bills, and 10 one dollar bills.

### Argument

**A.    The United States Should be Allowed to Proceed with Discovery Prior to Any Evidentiary Hearing on Jackson's Motion to Suppress.**

### 1. Motion to Compel Discovery

Jackson selectively asserted her Fifth Amendment privilege in response to the government's interrogatories, and also refused to provide the government with her tax returns (asserting that tax returns are somehow privileged) and wage and earning statements. She then filed a motion to suppress the evidence obtained during the search of her luggage as the fruit of an illegal search, and she simultaneously filed her own declaration.

Jackson's motion to suppress, however, is an attempt to avoid fully responding to the government's outstanding written discovery requests. Instead of responding to discovery, Jackson now seeks to suppress the search in the hopes that she will then be able to seek dismissal of the

---

[2]Jackson was ultimately released without being charged.

complaint. However, that effort is ill-founded. Even if this Court were to grant the motion to suppress, the government is still entitled to proceed with discovery in order to obtain untainted evidence to prove its forfeiture case. *United States v. $172,760 in U.S. Funds,* 2007 WL 4224932, at *2 (M.D. Ga., 2007); *United States v. $482,627.00 in U.S. Currency*, 2005 WL 1140603, at *3 (W.D. Tex. 2005); see also *United States v.$9,041,598.68*, 163 F.3d 238, 246 (5th Cir. 1998). Responses to discovery requests are sufficiently attenuated from illegally obtained evidence as to be untainted by any illegality of the initial seizure. *United States v. 47 West 644 Route 38, Maple Park, Illinois*, 962 F. Supp. 1081, 1090 (N.D. Ill 1997).

Jackson's responses to the United States' discovery requests are wholly inadequate. Specifically, Jackson's response to Interrogatory Nos. 1, 2, 4, 5, 6, 8, 10, and 14 were incomplete and non-responsive, and Jackson failed to produce any requested documents.[3]

Interrogatory No. 1 sought Jackson's identification and the amount of her rent or mortgage payments at each address she listed. Interrogatory No. 2 sought facts to support Jackson's contention that the defendant funds were not proceeds of illegal drug trafficking activity. Interrogatory No. 4 sought a factual basis for Jackson's claim to the defendant funds. Interrogatory No. 5 sought information about the specific sources from which defendant funds were derived. Interrogatory No. 6 sought specific information about Jackson's employers. Interrogatory No. 8 sought specific information about Jackson's vehicle loans. Interrogatory No. 10 sought information about Jackson's financial accounts. Interrogatory No. 14 sought information regarding Jackson's monthly expenses. Additionally, the United States' Production Request No. 5 sought Jackson's tax returns for the years 2001 through 2007.[4] Production Request No. 8 sought Jackson's wage and

---

[3]Courtesy copies of the government's discovery requests and Jackson's responses will be provided to the Court.

[4]Jackson baldly stated in her response that her tax returns were privileged, but this is incorrect. *See Poulas v. Naas Foods*, 959 F.2d 69, 74 (7th Cir. 1992) ("tax returns in the hands of a taxpayer are not privileged"); *see also United States v. $644,860.00 in U.S. Currency*, 2007 WL 1164361, at *1-2 (C.D. Ill. 2007) (the confidentiality laws regarding tax returns do not give the

earning statements for the last five years.

In response, Jackson selectively asserted her Fifth Amendment objection for every interrogatory except numbers 16 and 18, as well as for every production request. Jackson went on to choose to answer some of the interrogatories, but in a narrow and incomplete fashion. Jackson also asserted that interrogatory numbers 1, 6, and 10 were ambiguous, confusing, and unintelligible. She objected that interrogatory numbers 1, 6, 8, 10, and 14 exceeded the permissible scope of discovery because they sought irrelevant information. She further objected to interrogatory numbers 1, 2, 5, 6, 8, 10, and 14 as overbroad, burdensome and oppressive. She asserted that interrogatory number 6 was protected by an unspecified privilege and an undefined right to privacy. Additionally, Jackson asserted her purported right to privacy objection to production request number 5, seeking her tax returns, and she further objected to production request numbers 5 and 8 (seeking her work and earnings records) as overbroad, burdensome, and oppressive, and, further objected that request number 8 exceeded the permissible scope of discovery because it sought irrelevant information.

The foregoing discovery requests are relevant to and reasonably calculated to lead to the discovery of admissible evidence regarding key issues and allegations raised in Jackson's motion to suppress evidence and declaration, and, more importantly, regarding the government's Verified Complaint of Forfeiture. The government is entitled to the requested information because it will show the source of the defendant funds, her assets and expenses, and whether Jackson's assertions that the money was obtained legally are legitimate. *See United States v. $174,206.00 in U.S. Currency*, 320 F.3d 658, 662 (6th Cir. 2003) (holding that drug dealer's lack of legitimate income, as demonstrated by his federal tax returns, is sufficient to establish the forfeitability of his property by a preponderance of the evidence). This information goes to the heart of the United States' case. *See United States v. Approximately $5,145 in U.S. Currency*, 2006 WL 1479539 at *1 (E.D. Wis.

taxpayer the right to refuse to produce a return in response to a discovery request in a civil forfeiture case since a return is relevant to a forfeiture claim in that the returns may show a lack of legitimate income).

2006) (compelling discovery when interrogatories and production requests inquiring about claimant's net worth and use of defendant property would be at the heart of the upcoming trial; information would show defendant property was furnished in exchange for a controlled substance, constituted proceeds traceable to the purchase of a controlled substance, or was used to facilitate a violation of the Controlled Substances Act). *Accord Salstone v. General Felt Industries*, 1986 WL 13738, at \*\*1-2 (N.D. Ill. 1986) (documents establishing net worth are relevant).

Additionally**,** if Jackson contends that she has no tax records in her possession, this Court should compel her to authorize the release of her tax returns from the Internal Revenue Service.[5] The government has provided Jackson with the authorization of release of tax returns form on two occasions.

Further, the undersigned Assistant United States Attorney attempted to resolve this discovery dispute, in compliance with Rule 37(a)(2) and Local Rule 37.2, without court involvement by telephoning claimant's counsel, David Michael, on approximately August 1, 2008, and also leaving voice mail messages for counsel on August 7 and 8, 2008, attempting to obtain full and compete answers to the discovery in issue.  Those calls were preceded with a letter dated July 16, 2008, fully detailing the discovery requested and the inadequacy of claimant's responses.  *See* Exhibit A, attached hereto.  Mr. Michael promised to respond to that letter in writing.  However, to date, the government has not received a response to that letter from Mr. Michael.  On August 8, 2008, Mr. Michael told the undersigned that he is not currently in a position to amend any of his objections to the government's requests.  Thus, based on claimant's lack of response, she has made it quite clear,

_____

[5]*See United States v. $30,029.00 in United States Currency*, 2008 WL 2245703, at \*2 (S.D. Fla. 2008) (striking claimant's claim and answer and entering default judgment of forfeiture when, *inter alia*, claimant refused to provide government with copies of tax returns or provide a fully signed IRS waiver form authorizing release of the returns from IRS).  *See also United States v. Three Bank Accounts...at First Bank & Trust, Brooking, South Dakota*, 2008 WL 915199, at \*7 (D.S.D. 2008) ("under Rule 34...documents are within a person's 'possession, custody, or control' if he 'has the legal right to obtain the document, even though in fact [he] has no copy' actually in his possession...If the party can obtain the document upon request,...it is within his 'control' because he has the legal right to obtain the document.").

unfortunately, that she will not produce responsive information, or clarify whether she will persist in her assertions of her Fifth Amendment privilege, without a court order.

**2.   Claimant's Request for Evidentiary Hearing Should Be Denied.**

Jackson's request for an evidentiary hearing on her motion to suppress is inappropriate at this time, and based upon her current assertions of the Fifth Amendment privilege, her request is not likely to ever be appropriate.  Evidentiary hearings on motions to suppress are not always required. *United States v. McGaughy*, 485 F.3d 965, 969 (7th Cir. 2007).

> A district court need conduct a hearing only when the allegations and moving papers are sufficiently definite, specific, non-conjectural and detailed enough to conclude that a substantial claim is presented and that there are disputed issues of material fact which will affect the outcome of the motion.

*Id.*  The only document Jackson has produced in support of her motion to suppress is her own declaration, which she filed simultaneously with the motion.  Jackson may not avoid responding to the government's discovery requests by asserting her Fifth Amendment rights, while simultaneously submitting a declaration in an attempt to create a material issue of fact in order to obtain an evidentiary hearing on her motion to suppress.[6]  No evidentiary hearing should go forward until the government is able to complete its discovery, including obtaining full and responsive answers to all interrogatories and document requests, and the deposition of Jackson, in order to determine whether Jackson can produce any evidence to substantiate her claim and the corresponding allegations in her

---

[6]*Cf. United States v. $433,850.00 in U.S. Currency*, 473 F. Supp. 2d 685 (E.D.N.C. 2007) (Claimant cannot "manufactur[e] a genuine issue of material fact" by asserting that he obtained seized currency lawfully but then invoking the Fifth Amendment whenever questioned on the issue); *United States v. U.S. Currency in the Sum of $185,000 More or Less*, 455 F. Supp. 2d 145, 150-51 (E.D.N.Y. 2006) (Claimant is entitled to assert the Fifth Amendment in a civil forfeiture case, but he bears the consequences of failing to adduce evidence sufficient to oppose Government's motion for summary judgment; claimant who asserts Fifth Amendment at his deposition cannot submit an affidavit to create a material issue of fact); *United States v. $110,873.00 in U.S. Currency*, 159 Fed. Appx. 649, 652-53 (6th Cir. 2005) (Claimant who invoked Fifth Amendment to avoid answering interrogatories cannot "cry foul when the absence of evidence in favor of the litigant requires summary judgment to be entered against him").

declaration.

If Jackson stands on her bald assertions of her Fifth Amendment privilege, then she has essentially forfeited any right to an evidentiary hearing on her motion to suppress.[7]  Should Jackson stand on her Fifth Amendment objections, the government is entitled to an adverse  inference as to all discovery requests, which would negate any possible right to a suppression hearing, or to contest the seizure of the defendant funds while hiding behind her Fifth Amendment privilege as a shield. *See e.g. United States v. Certain Real Property 6250 Ledge Road, Egg Harbor* 943 F.2d 721, 729 (7th Cir. 1991)(blanket assertion of Fifth Amendment privilege is no defense in a civil forfeiture action); *United States v. 6238 Beaver Damn Road*, 1992 WL 137148 at *5 (N.D.IL 1992) (following *United States v. Rylander*, 460 U.S. 752 (1983) and *Baxter v. Palmigiano*, 425 U.S. 308 (1976), district court held that claimant's refusal to answer questions in civil forfeiture case based on his Fifth Amendment right to remain silent allowed court to draw adverse inferences); *United States v. 15824 W. 143rd Street, Lockport*, 736 F. Supp. 882, 886 (N.D.IL 1990). *Accord United States v. $9,630 in U.S. Currency*, 2007 WL 2572199 at *4 (D. Utah 2007) (same).

**B.    Response to Motion to Suppress**

If this Court elects to first conduct an evidentiary hearing on the motion to suppress prior to compelling full discovery, the government submits that the seized evidence should not be suppressed.  Jackson gave her consent to the agents to search her bag on the train, and that consent was freely and voluntarily given.  The entire encounter on the train was consensual, and Jackson was not under arrest, so neither she nor her luggage were illegally seized, and her consent was not invalid.  Even assuming that Jackson's consent was not valid, the agents would still have inevitably discovered the defendant funds because by the time they opened the bag on the train, they had a reasonable suspicion to detain Jackson's bag to permit a further narcotics detection canine inspection.

---

[7]See footnote 6, *supra*.

## 1.     Jackson Gave the Agents Her Consent Freely and Voluntarily.

Jackson gave the agents oral consent to search her bag while they were on the train.  After picking up Jackson's locked bag, one of the agents asked Jackson if she had the combination or key for the bag.  Jackson hesitated, then stated that she did not.  The officer then asked Jackson if he could open the bag by popping the zipper, and Jackson gave her consent.   It is "well settled" that consent to search is "one of the specifically established exceptions to the requirements of both a warrant and probable cause." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)(warrantless search permissible under Fourth Amendment when defendant voluntarily consents to the search); *United States v. Strache*, 202 F.3d 980, 984 (7th Cir. 2000).

Jackson's consent was freely and voluntarily given, even though she later refused to sign a written consent to search form.  *See United States v. Thompson*, 876 F.2d 1381,1384 (8th Cir. 1989) (finding oral consent was voluntary even though defendant refused to sign consent form); *see also United States v. Strache*, 202 F.3d at 985 (verbal consent to search is sufficient); *United States v. Willis*, 61 F.3d 526,530-32 (7th Cir. 1995) (allowing verbal consent to search).  "Whether a consent is voluntary is dependent on the totality of circumstances."  *United States v. Grap*, 403 F.3d 439, 443 (7th Cir. 2005).

> Among the factors that aid in determining whether consent was freely given are the age, education, and intelligence and...mental health and capability of the person giving consent; whether the person giving consent  did so immediately or only after repeated requests by the police; whether physical coercion was used to obtain consent; and whether the person giving consent was in custody.  We also consider whether the officer advised the person asked to give consent of her right to refuse, although the absence of this factor is not fatal to the government proof of voluntary consent.

*Id.* (internal citations omitted)

Jackson's situation is analogous to that of the defendant's in *United States v. Bernitt*, 392 F.3d 873, 877 (7th Cir. 2004).  In that case, the court found that the defendant was an intelligent, articulate adult, and the police did not badger him for information or consent.  *Id.* The officers did not physically abuse or pressure him, and the defendant was in custody only three to four minutes

before officers solicited his consent. *Id.* The *Bernitt* court found it troubling that defendant had been arrested, handcuffed in the back of a squad car, and not advised of his rights before giving consent. *Id.* However, looking at the totality of the circumstances, the court found that defendant's consent was voluntary. *Id.*

Just as in *Bernitt*, Jackson's consent on the train was also voluntary. She is a normal and reasonably intelligent adult, and the agents did not badger her for information or consent. The agents also did not physically abuse or pressure her in any way. The entire encounter on the train was consensual. Jackson was not under arrest, in custody, or detained at any point while she was on the train, and was free to reject the agents request to inspect her luggage. While she was not specifically advised of her right to refuse consent, the totality of the circumstances establish that Jackson voluntarily gave her consent.

**2. The Initial Encounter on the Train Was Consensual**.

The Fourth Amendment does not forbid all searches and seizures, but rather, only those that are unreasonable. *Elkins v. United States,* 364 U.S. 206, 213 (1960). Not all police/citizen encounters implicate Fourth Amendment concerns. *Terry v. Ohio,* 392 U.S. 1, 19 n. 16 (1968). If agents stop individuals and seek their voluntary cooperation through noncoercive questioning, the encounter is not a seizure under the Fourth Amendment. *United States v. Robinson*, 30 F.3d 774, 782 (7th Cir. 1994). The proper test for determining whether a given encounter rises to the level of a Fourth Amendment seizure on a train is "whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter."[8] *Florida v. Bostick*, 501 U.S. 429, 436 (1991).

There is no seizure when, as here, an agent merely approaches a traveler and, after identifying himself, begins to ask routine questions relating to the individual's identification, travel plans, and ticket information. *United States v. Odum*, 72 F.3d 1279, 1283 (7th Cir. 1995). These

---

[8] The reasonable person presupposes an "innocent person." *Bostick*, 501 U.S. at 438.

encounters require no suspicion whatsoever to initiate. *United States v. Berke*, 930 F2.d 1219, 122 n.5 (7th Cir. 1991). The no suspicion requirement applies to encounters taking place with passengers in their sleeper cars on Amtrak trains. *United States v. Rem*, 984 F.2d 806, 812 (7th Cir. 1993), *citing United States v. Colyer*, 878 F.2d 469, 475-476 (D.C. Cir. 1989) ("[w]hile an Amtrak sleeper car may in some ways resemble a residence, it enjoys no such status in the law."); *United States v. Tartaglia*, 864 F.2d 837, 8411 (D.C. Cir. 1989) (no heightened expectation of privacy in train roomette; automobile exception applied); *see also United States v. Little*, 18 F.3d 1499, 1504 (10th Cir. 1994) (en banc) (no higher expectation of privacy in train roomette); *United States v. Kim*, 27 F.3d 947, 952 n.2 (3d Cir. 1994) (train sleeper car was public place). "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a 'seizure' has occurred." *Terry*, 392 U.S. at 19 n.16; *United States v. Johnson*, 910 F.2d 1506, 1508 (7th Cir. 1990)(no need for *Terry* reasonable suspicion analysis when agents who detained bag told passenger she could refuse to consent to dog sniff and was free to go; no Fourth Amendment rights implicated in consensual encounter). Moreover, when a defendant consents to questioning by police, there is no Fourth Amendment seizure, *United States v. Parker*, 936 F.2d 950, 953 (7th Cir. 1991), and an agent's non-threatening request to search the individual's luggage will not convert an otherwise consensual interview into an investigatory stop. *See Bostick*, 501 U.S. at 435; *Odum*, 72 F.3d at 1983.

Here, the agent's affidavit to the Verified Complaint establishes that the initial encounter with Jackson was consensual. The agents approached Jackson's sleeper room and found the door open. The agents were dressed like ordinary citizens. They did not display any weapons or handcuffs or any coercive indicia of their authority. They identified themselves and their purpose for speaking with Jackson. She consented to the interview and voluntarily answered their questions. No coercive or intimidating questions were asked. Upon request, Jackson produced her identification and gave consent to search her bag. Jackson left the train under her own power and she was not physically assisted in any way. The initial encounter upon the train was a consensual

12

one and the "suspicion that [was] required is zero." *United States v. Edwards*, 898 F.2d 1273, 1276 (7th Cir. 1990). Accordingly, there was no unlawful Fourth Amendment violation at any point during the agents' encounter with Jackson.

> **3.    The Currency Found in Defendant's Bag Is Admissible Pursuant to the Inevitable Discovery Doctrine**.

Even assuming Jackson did not consent to the search or that her consent was invalid, this Court should still deny the motion to suppress. The facts demonstrate that even if the agents had not obtained consent, the evidence discovered in Jackson's bag would have still been inevitably discovered. If Jackson had truly refused to grant the agents consent to search her luggage, the agents would have detained her luggage and called for the narcotics detection canine, which of course would have alerted for the presence of narcotics, eventually leading to a search warrant independent of the actual initial search conducted on the train.

The inevitable discovery doctrine is a widely recognized exception to the exclusionary rule. Under the doctrine, "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale [of the exclusionary rule] has so little basis that the evidence should be received." *Nix v. Williams*, 467 U.S. 431, 444 (1984). *See also United States v. Gravens*, 129 F.3d 974, 979 (7th Cir. 1997). To demonstrate that a discovery was truly "inevitable," the government must establish that it had probable cause as well as prove the existence of "a chain of events that would have led to a warrant . . . independent of the search." *United States v. Timothy Brown*, 328 F.3d 352, 357 (7th Cir. 2003); *United States v. Brown*, 64 F.3d 1083, 1085 (7th Cir. 1995). In other words, the court must determine "what would have happened had the unlawful search never occurred." *United States v. Kennedy*, 61 F.3d 494, 498 (6th Cir. 1995) (citing *United States v. Eng*, 971 F.2d 854, 861 (2d Cir. 1992)).

13

In this case, the agents requested Jackson's permission to search her bag on the train, but they already had reasonable suspicion to believe that Jackson's luggage contained evidence of a crime at the time they made the request. The evidence that supports this view includes Jackson's irregular travel itinerary that day, her extreme nervousness and anxiety, her hesitant and vague responses to the agents' questions, her admission that she did not have a key to the lock on one of her own bags, her lie to the agents regarding the presence of money in the bag, and the fact that, when the agent picked up the bag, it felt heavy, suggesting that it contained money.

If called to testify, the agents would state that if Jackson had not given her consent to search her baggage, they would have detained the bag and called for the narcotics detection canine ("Andy"). This is the same dog that in fact performed a "sniff" test on the luggage. Given that "Andy" had alerted positively for the odor of narcotics after the agents had searched the bag, it is equally certain that "Andy" would have positively alerted in the exact same fashion had Jackson unequivocally refused to grant the agents' consent to search her luggage. A positive alert from "Andy," in conjunction with the agents' pre-existing reasonable suspicion with respect to the bag, certainly would have been sufficient for a magistrate judge to have found probable cause for a search warrant.

As indicated in the Seventh Circuit's decisions in *Brown* and *Gravens*, *supra,* the inevitable discovery analysis consists of two parts. First, the government must show that the agents would have had probable cause to procure a search warrant from a magistrate judge. In this case, assuming that Jackson had refused to give the agents consent to search her luggage, it was the intention of the agents to summon "Andy" and have him perform an inspection of Jackson's luggage. "Andy" would have certainly alerted positive to the luggage. Armed with the positive alert and the other suspicious circumstances surrounding Jackson and her bag, a magistrate judge would have had

14

sufficient probable cause to issue a warrant to search the luggage. As we now know, a search conducted pursuant to a warrant would have revealed the currency contained in Jackson's luggage.

The second prong of the inevitable discovery analysis is that the government must show "by a preponderance of the evidence that it would have been able to recover the challenged evidence through lawful means." *Gravens*, 129 F.3d at 980 (citing *United States v. Jones*, 72 F.3d 1324, 1334 (7th Cir. 1995)). In other words, the government must show that the agents would have been able to secure a warrant without relying on the challenged evidence of currency in the warrant affidavit. The government can squarely meet this burden. The agents did not need, nor would they have used, in their application for a warrant the fact that they found currency in Jackson's bag following the purportedly involuntary search.

The agents' basis for a search warrant would have been a positive narcotics alert from Andy,[9] Jackson's suspicious travel itinerary, her extreme nervousness and apparent anxiety, her hesitant and vague responses to the agents, the fact that she did not have a key to the lock on one of her own bags, the weight of her bag, and Jackson's lie to the agents about the presence of currency in her bag. This information, without any reference to the results of the examination of Jackson's bag pursuant to her consent, would have established probable cause for a warrant.[10]

_____

[9]*See United States v. $30,670 in U.S. Funds*, 403 F.3d 448, 462 (7th Cir. 2005) (scientific evidence establishes that dogs do not alert to the smell of cocaine but only to the smell of methyl benzoate, a volatile byproduct; thus, dogs do not alert to innocently tainted currency in general circulation but only to currency that "has been exposed to large amounts of illicit cocaine within the very recent past"; accordingly, "a properly trained dog's alert to currency should be entitled to probative weight"); *United States v. $22,474 in U.S. Currency*, 246 F.3d 1212, 1216 (9th Cir. 2001) (same); *United States v. Funds in the Amount of $45,050.00*, 2007 WL 2323307, at *4 (N.D. Ill. 2007) (following $30,670, positive dog sniff is sufficient to allege a substantial connection between seized currency and a drug offense).

[10]"Courts have generally held that an alert by a trained drug sniffing dog can, by itself, provide probable cause to support a search warrant." *United States v. Sanchez,* 1999 WL 33657684, at *9 (N.D. Ia. 1999); *United States v. Limares,* 269 F.3d 794, 797 (7th Cir. 2001); *United States v.*

Therefore, the government respectfully submits that the currency found in Jackson's luggage would have been inevitably discovered by means of a valid search warrant once the agents called for the narcotics detection canine.  Thus, the currency is not suppressible.

### Conclusion

WHEREFORE, the government respectfully requests that this Court deny Jackson's request for an evidentiary hearing on her motion to suppress, compel Jackson to respond fully and completely to the United States' discovery requests within five days of any order issued by this Court, and deny her motion to suppress.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By: /s/ Charles E. Ex_____
CHARLES E. EX
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 353-4305

---

*Thomas,* 87 F.3d 909, 912 (7th Cir. 1996) (dog's positive reaction for narcotics provides probable cause); *United States v. Funds in the Amount of $30,670,* 403 F.3d 448 (7th Cir. 2005).